Charles A. Newman (admitted *pro hac vice*)
Douglas W. King (admitted *pro hac vice*)
Elizabeth T. Ferrick (admitted *pro hac vice*)
James M. Weiss (admitted *pro hac vice*)
BRYAN CAVE LLP
211 North Broadway, Suite 3600
St. Louis, MO 63102-2750
Telephone: 314.259.2000
Facsimile: 314.259.2020

Eugene A. Ritti ISB No. 2156
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, ID 83701-1617
Telephone: 208.344.6000
Facsimile: 208.342.3829
Email: ear@hteh.com

Attorneys for Defendant First American
Title Insurance Company

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DEBORAH LEWIS,<br><br>    Plaintiff,<br><br> v.<br><br>FIRST AMERICAN TITLE INSURANCE COMPANY,<br><br>    Defendant. | Case No. 06 CV 00478 EJL<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND MEMORANDUM IN SUPPORT THEREOF FILED AUGUST 4, 2008** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................1

II.   STATEMENT OF FACTS....................................................................................2

    A.   First American's Rate Manuals and Business Practices Vary Significantly From
        State to State.................................................................................................2
        1.    Idaho ...............................................................................................2
        2.    Washington ......................................................................................4
        3.    Oregon.............................................................................................5
        4.    New Mexico .....................................................................................6
        5.    Arizona ............................................................................................7

    B.   Plaintiff Deborah Lewis.................................................................................7
        1.    Plaintiff's Transaction in Idaho.........................................................7
        2.    Plaintiff's Lawsuit and Motion for Certification of a Multi-State Class
              Action ..............................................................................................8

    C.   Plaintiff's "Evidence" (Or Lack Thereof) In Support of Class Certification..............10
        1.    Plaintiff Submitted 18 HUD-1s, But Only One Transaction Was
              Possibly Entitled to a Discount. ......................................................10
        2.    Plaintiff's Review of 112 Oregon HUD-1 Settlement Statements Is
              Inaccurate and Contains Glaring Miscalculations. ............................11

    D.   First American Does Not Have the Necessary Data to Identify Putative Class
        Members in Any of the Five States..................................................................13
        1.    First American's Data Capabilities in Idaho, Washington And Oregon .......13
        2.    First American's Data Capabilities in Arizona and New Mexico ...................14

III.  ARGUMENT .......................................................................................................15

    A.   This Court Must Undertake a Rigorous Analysis of All of the Rule 23
        Requirements................................................................................................15

    B.   Rule 23(b)(3)'s Predominance Requirement Is Not Satisfied. ............................16
        1.    Individual Issues of Fact Predominate Over Common Questions. ...............16
        2.    Unique Variations in State Law Also Make This Case Unsuitable For
              Classwide Adjudication:  Class Members Must Exhaust Administrative
              Remedies in Arizona and Oregon. ...................................................22

    C.   Plaintiff's Claim Is Not Typical of Class Members in Washington, Oregon, New
        Mexico, and Arizona. ...................................................................................24

    D.   Lewis Is an Inadequate Class Representative. ..................................................26

i

**Defendant's Opposition to Class Certification**

       1.     Plaintiff's Claims Are Subject to a Unique Defense. ........................................ 26

       2.     Plaintiff Lacks the Knowledge, Understanding and Control to Serve as Class Representative. ........................................................................................ 27

  E.     This Putative Multi-State Class Action Is Not Manageable. ......................................... 29

       1.     Due Process Requires Plaintiff To Prove Liability On An Individual Basis. ............................................................................................................ 29

       2.     An Aggregate Damage Analysis Is Improper. ...................................................... 31

       3.     Use of A Special Master Is Impermissible. .......................................................... 33

  F.     A Class Action Is Not the Superior Method of Adjudicating Plaintiff's Claims ......... 34

  G.     The Proposed Class Cannot Be Certified Under Both Rule 23(b)(2) and 23(b)(3). .................................................................................................................. 34

IV.   CONCLUSION ..................................................................................................................... 35

**Defendant's Opposition to Class Certification**

# TABLE OF AUTHORITIES

## CASES

Amchem Prods, Inc. v. Windsor,

    521 U.S. 591 (1997) ...........................................................................15

Arthur v. Ticor Title Ins. Co. of Florida,

    CA AMD 07-1737 (D. Md Mar. 11, 2008.) ...................................24

Beaser East, Inc. v. Mead Corp.,

    412 F.3d 429 (3d Cir. 2005) ...........................................................33

Bell Atlantic Corp. v. Rochelle,

    339 F.3d 294 (5th Cir. 2003) .................................................... 30, 32

Berger v. Compaq Computer Corp.,

    257 F.3d 475 (5th Cir. 2001) ......................................................... 27

Bodner v. Oreck Direct, LLC,

    2007 WL 1223777 (N.D. Cal. April 25, 2007) .............................28

Broussard v. Meineke Discount Muffler Shops, Inc.,

    155 F.3d 331 (4th Cir. 1998) .................................................... 30, 32

Butt v. Allegheny Pepsi Cola Bottling Co.,

    116 F.R.D. 486 (E.D. Va. 1987) ............................................... 30, 33

Castano v. American Tobacco Co.,

    484 F.3d 734 (5th Cir. 1996) .........................................................22

Cimino v. Ray-Mark Indus.,

    151 F.3d 297 (4th Cir. 1998) ............................................... 30, 32, 33

Deiter v. Microsoft Corp.,

    436 F.3d 461 (4th Cir. 2006) ...........................................................24

**Defendant's Opposition to Class Certification**

Duke v. Walmart, Inc.,

    509 F.3d 1168 (9th Cir. 2007) ................................................................. 15

Eisen v. Carlisle & Jacquelin,

    417 U.S. 156 (1974) ................................................................................... 29

Eisen v. Carlisle & Jacquelin,

    479 F.2d 1005 (2d Cir. 1974) .................................................................. 30

Ekahem v. Health and Hosp. Corp.,

    724 F.2d 563 (7th Cir. 1983) .................................................................... 24

Estate of Bohn v. Waddell,

    174 Ariz. 239, 848 P.2d 324 (Ct. App. 1992) ......................................... 23

Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,

    903 F.2d 176 (2d Cir. 1990) .................................................................... 26

Griffin v. GK Intelligent Systems,

    196 F.R.D. 298 (S.D. Tx. 2000) .............................................................. 28

Haley v. Medtronic, Inc.,

    169 F.R.D. 643 (N.D. Cal. 1996) ............................................................ 34

Hanon v. Dataproducts Corp.,

    976 F.2d 497 (9th Cir. 1992) ................................................................... 26

In re Bituminous Coal Operators' Ass'n,

    949 F.2d 1165 (D.C. Cir. 1991) .............................................................. 33

In re Escher,

    369 B.R. 862 (Bankr. E.D. Pa. 2007) ..................................................... 27

In re Fibreboard,

    893 F.2d at 706 (5th Cir. 1990) ............................................................... 30

iv

**Defendant's Opposition to Class Certification**

In re Fields,

    2006 WL 2191342 (Bankr. E.D. Pa. July 31, 2006) .................................................................27

In re Glauser.,

    365 B.R. 531 (Bankr. E.D. Pa. 2007) .................................................................27

In re Madera,

    363 B.R. 718 (Bankr. E.D. Pa. 2007) .................................................................27

In re Initial Public Offering Sec. Litig.,

    471 F.3d 24 (2d. Cir. 2001) .................................................................15

In re Rhone-Poulenc Rorer, Inc.,

    51 F.3d 1293 (7th Cir. 1995) .................................................................23

Jones v. Aames Funding Corp.,

    282006 WL 2845689 (E.D. Pa. Mar. 7, 2006) .................................................................27

Kline v. Coldwell, Banker & Co.,

    508 F.2d 226 (9th Cir. 1974) ................................................................. 30, 32

Lundquist v. Security Pac. Auto Serv. Corp.,

    993 F.2d 11 (2d Cir. 1993) .................................................................24

Maywalt v. Parker & Parsley Petroleum Co.,

    67 F.3d 1072 (2d Cir. 1995) .................................................................29

Newton v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.,

    259 F.3d 154 (3d Cir. 2001). .................................................................17, 30, 32

Osuna v. Wal-Mart Stores, Inc.,

    2004 WL 325430 (Ariz. Super. Dec. 23, 2004) .................................................................22

Ricciardi v. Ameriquest Mortg. Co.,

    164 Fed. Appx. 221 (3d Cir. 2006) ................................................................. 26, 27

v

**Defendant's Opposition to Class Certification**

Saey v. CompUSA, Inc.,

    174 F.R.D. 448 (E.D. Mo. 1997) ............................................................... 22, 33

Sicinski v. Reliance Funding Corp.,

    482 F.R.D. 730 (S.D.N.Y. 1979) ................................................................... 28

Sikes v. Teleline, Inc.,

    281 F.3d 1350 (11th Cir. 2002) .................................................................. 30, 32

Smith v. Block,

    784 F.2d 993 (9th Cir. 1986) ....................................................................... 19

Stump v. WMC Mortg. Corp.,

    2005 WL 645238 (E.D. Pa. Mar. 16, 2005) ................................................... 27

Szabo v. Bridgeport Machines, Inc.,

    249 F.3d 672 (7th Cir. 2001) ....................................................................... 15

Thorn v. Jefferson-Pilot Insurance Co.,

    445 F.3d 311 (4th Cir. 2006) ....................................................................... 35

Trujillo v. Pac. Safety Supply,

    84 P.3d 119 (Or. 2004) .............................................................................. 23

Uyehara v. Guarantee Title & Trust Co.,

    2008 WL 2227295 (Ct. of Common Pleas of Phila. County, Pa. Apr. 21, 2008), appeal docketed (Pa. Super. Ct. May 13, 2008) ...................................................... 23

Valentino v. Carter-Wallace, Inc.,

    97 F.3d 1227 (9th Cir. 1996) ....................................................................... 16

White v. Conestoga Title Ins. Co.,

    2008 WL 2227297 (Ct. of Common Pleas of Phila. County, Pa. Apr. 21, 2008), appeal docketed (Pa. Super. Ct. May 13, 2008). ...................................................... 23

**Defendant's Opposition to Class Certification**

Windham v. American Brands, Inc.,

    565 F.2d 59 (4th Cir. 1977) ..............................................................................30

Windham v. American Brands, Inc.,

    565 F.2d 59, 70 (4th Cir. 1977) ........................................................................33

Zimmerman v. Bell,

    800 F.2d 386 (4th Cir. 1986) ...........................................................................35

Zinser v. Accufix Research Institute, Inc.,

    253 F.3d 1180 (9th Cir. 2001)..........................................................16, 22, 34, 35

## STATUTES

A.R.S. § 20-376 ...................................................................................................................23

A.R.S. § 20-379 ...............................................................................................................23, 34

Or. Rev. Stat. § 737.505 ................................................................................................23, 34

## OTHER AUTHORITIES

Fed.R.Civ.P. 23................................................................................1, 15, 16, 29, 34, 35

**Defendant's Opposition to Class Certification**

2937647.6

# I.    INTRODUCTION

Plaintiff's motion to certify a five-state class against First American Title Insurance Company ("First American") stretches the scope of Rule 23 well past its breaking point.  The case is not certifiable even if limited to Idaho but certainly not for five disparate states.  No named plaintiff has ever moved for, much less obtained certification of, a randomly selected, multi-state class action against a title insurer based on a single purported overcharge for one title insurance policy in one state.  The arguments militating against such an unwieldy and disjointed class action are clear and pervasive.  Plaintiff is not an adequate or typical representative for a class of customers in Washington, Oregon, New Mexico, or Arizona.  She never bought a title insurance policy and has not been injured by any alleged overcharge in those states.

The marked differences in the rate manuals governing the charges for title insurance in each of the five states, and the individual factual liability issues they spawn, also make this case inappropriate for classwide adjudication.  Whether Ms. Lewis was entitled to a discount in Idaho does not prove anyone else was entitled to a discount in Idaho, much less in Washington, Oregon, New Mexico, or Arizona.  Crucial differences in substantive state law governing plaintiff's claims, i.e. whether an administrative remedy must be exhausted prior to filing suit, also doom this multi-state putative class.  Even if plaintiff were an adequate and typical representative of a class of Idaho customers (which she is not), this multi-state class action is unmanageable, inefficient, and a waste of this Court's and the parties' time and resources.  The individual issues that are raised in this putative class action even as to a single state destroy any efficiencies that may otherwise be gained through class adjudication.  Finally, the unreliable and inadmissible "evidence" plaintiff submitted with her motion cannot support certification of a class of Idaho customers, much less a five-state class.

**Defendant's Opposition to Class Certification**

## II.      STATEMENT OF FACTS

**A.      First American's Rate Manuals and Business Practices From State to State Vary Significantly.**

First American is a nationwide underwriter of title insurance policies and operates across the United States – including in Idaho, Washington, Oregon, New Mexico, and Arizona - through a network of direct offices and independent agents.  Doc. 36-2 ¶ 3.  Although First American writes title insurance policies in Oregon, the volume of policies insuring residential property is relatively small because the majority of policies are underwritten by Title Insurance Company of Oregon ("Title Co.") which, though a subsidiary of First American, is a separate insurance company recognized as distinct by the Oregon insurance authorities.  Declaration of Alan Brickley ("Brickley Dec.") ¶ 2.  Title Co. is not a defendant in this case.  Doc. 7.

First American has rate manuals in Idaho, Washington, Oregon, and Arizona that govern the premium rates for policies insuring property in those states.  Doc. 36-2.  In New Mexico, rates are promulgated by the state.  Declaration of Gary Sandoval ("Sandoval Dec.") ¶ 4.  Those rates vary significantly from state to state and, in some cases, from county to county.  Moreover, because the business of title insurance is largely dependent on local practices, the process for issuing policies varies from state to state.  Doc. 36-2.  Specifically, as set forth below, what constitutes sufficient evidence of prior insurance to qualify a refinance transaction for a discount is not uniform.

### 1.      Idaho

In Idaho, when a lender's title policy is issued within two years of a prior lender's policy insuring the same property, the rate manual provides that a discount of 50% is available.  Declaration of Renny Brayton ("Brayton Dec.") ¶¶ 5-6.  This discounted rate – called the reissue rate – expressly requires that a copy of that prior policy be presented to First American or that reasonable proof of insurance be provided to First American.  Id. ¶ 6.

2

**Defendant's Opposition to Class Certification**

Title commitments, prepared after an order is placed, indicate the prior unsatisfied deeds recorded against the property but do *not* tell whether the mortgage is insured by a prior title policy. Id. ¶ 14. Despite this fact, First American's direct operations in Idaho, as a matter of routine, usually give the reissue rate discount to transactions in which the title commitments reveal a first mortgage to an institutional lender within the two-year look back period. Id. ¶ 15. In certain instances, however, it is necessary to make further inquiry to determine whether a prior mortgage is insured. Id. ¶ 16. If the title commitment reveals a second or other junior mortgage, First American looks to the recorded document to identify the entity that recorded the document. Id. If it was recorded by a title company, First American will contact the title company to determine whether the junior mortgage was insured. Id. Consistent with the rate manual, some of First American's independent agents embrace the acquisition of the prior policy as a requirement before the new policy can be issued at the reissue rate, and they state this requirement in the title commitment. Id. ¶ 20.

In order to determine what premium rate was charged for any given transaction in Idaho, the Court will need far more than just the HUD-1 and title report. Id. ¶ 30. Neither document reveals the liability amount of the prior policy, which is necessary to calculate the reissue rate in Idaho. Id. The liability amount can only be found by locating a copy of the prior policy or by looking at the actual recorded deed of trust that was insured. Id. First American also offers several levels of coverage for policies issued in Idaho, including a standard policy, an Eagle policy, and an extended coverage policy. Id. ¶ 21. The rates for the extended lender's policy and the Eagle lender's policy exceed the basic rate by 30% and 40% respectively. Id. ¶¶ 22-23. In a refinance transaction, the lender requests the level of coverage (*i.e.*, standard, Eagle, extended) at the time the order is placed. Id. ¶ 21. It is necessary to obtain and to review a full copy of the title insurance policy itself

3

**Defendant's Opposition to Class Certification**

or a copy of the lender's instructions from the title file to determine what coverage the policy provided and thus what rate was charged.  <u>Id</u>. ¶ 31.

### 2. Washington

For the majority of the class period, First American had *17* different rate manuals in Washington.   Declaration of Michael Moore ("Moore Dec.") ¶ 4.   Each provides for a reorganization rate, which is 50% of the standard rate, and is generally available when there is a prior lender's policy insuring a deed of trust on the same property.  <u>Id</u>. ¶ 6.  Some rate manuals require that the prior policy insured a deed of trust to the same borrower; others do not.  <u>Id</u>.  The 17 rate manuals also impose a wide range of rates.  During most of the class period, the rate for a standard policy insuring a $100,000 mortgage varied from $485.00 to $590.00.  <u>Id</u>. ¶ 7.

In Washington, on receipt of an order, First American hires a title examiner to prepare the title commitment.  She reviews the chain of title, which lists documents recorded against the property at issue.  <u>Id</u>. ¶ 11.  The title examiner then obtains and examines copies of specific documents in the chain of title, such as prior mortgages, to determine if a prior policy insured title to the property.  <u>Id</u>. ¶ 12.  Recorded documents in Washington generally have a stamp that indicates who recorded the document and a handwritten policy number that indicates if a prior insurance policy was issued on the property.  <u>Id</u>. ¶ 13.  First American's direct operations in Washington accept the notation as sufficient evidence of prior insurance.  <u>Id</u>.  Because the recorded documents must be reviewed, it is not possible to determine whether a transaction qualified for and was given the reorganization rate simply from a review of the HUD-1 and the title commitment as plaintiff suggests.  <u>Id.</u> ¶ 48.  Instead, assuming that the title commitment even identifies a prior recorded mortgage, the actual prior recorded document must be pulled from the title plant for each

4

transaction (the prior recorded documents are not kept in First American files).[1]  Id. ¶ 49.  This is a

manual process that must be completed on a file-by-file basis.

### 3.      Oregon

For most of the class period, Title Co., a separate title underwriter and not a defendant in

this case, filed rates with the Department of Insurance.  Declaration of Alan Brickley ("Brickley

Dec.") ¶ 4.  After April 3, 2006, however, Title Co. joined the Oregon Title Insurance Rating

Organization ("OTIRO"), an association of title insurance underwriters in Oregon, to satisfy its rate

filing requirements.  Id. ¶ 5.  In Oregon, under both manuals, a "short term rate" is available on a

policy when there has been a prior policy issued within the three years immediately preceding the

new transaction.  Id. ¶¶ 7-8.  This rate was 80% of the standard rate under the pre-2006 manual, and

it is 75% of the standard rate under the OTIRO manual.  Id.

When an order is placed with a Title Co. branch office, the title officer reviews the chain of

title for prior mortgages, conveyances, and deeds of trust.  Id. ¶ 12.  The standard practice is for any

title company recording the document to place its name and file number on it.  This notation is

usually an indication that insurance was issued in conjunction with the recording, and Title Co.

generally accepts it as sufficient evidence of prior insurance to qualify a refinance transaction for the

discounted, short term rate.  Id. ¶ 13.   In order to calculate the appropriate premium and determine

whether the short term rate applies, it is necessary to obtain and to review the actual recorded

documents.  Id. ¶ 24.  Title Co. also offers both standard and extended coverage policies in Oregon.

Id. ¶ 9.  Lenders in Oregon generally request extended coverage policies.  Id. ¶ 10.  The rate for an

extended coverage policy is 30% over the basic rate for one- to four-family residential properties.

---

[1] A title plant contains copies of all documents that are recorded in a particular county.  Most title plants in Washington are computerized.  The county records are input by data entry personnel. Non-computerized plants consist of file folders containing copies of recorded documents.  Moore Dec. ¶ 50.

**Defendant's Opposition to Class Certification**

Id.  Every title or escrow file needs to be reviewed to determine what type of coverage was requested to know if the extended coverage rate applies.  Id. ¶ 24.  This information does not appear on the HUD-1 or title commitment.  Id. at 22.  If the prior recorded mortgage is not in the title file, it would be necessary to obtain a copy of that document from the title plant.  Id. ¶ 24.

### 4.    New Mexico

In New Mexico, the State Insurance Department issues regulations that set the rates title insurance companies, including First American, can charge.  Sandoval Dec. ¶ 4.  The substitution rate is available on title policies when a lender's policy is issued in a refinance transaction that pays off a mortgage that has already been insured.  Id. ¶ 5.  The substitution rate varies from 40% to 80% of the standard rate depending on the length of time between the policies.  Id

In New Mexico, First American issues policies through both direct operations and a network of 75 to 85 agents.  Id. ¶ 6; Declaration of Charles Woods ("Woods Dec.") ¶ 6.  In a typical transaction, when preparing a title commitment, the title examiner looks at prior recorded mortgages or deeds of trust in the chain of title.  Woods Dec. ¶ 7; Sandoval Dec. ¶ 8.  Looking at the title commitment, actual mortgage, or deed of trust does not reveal whether a prior mortgage or deed of trust was insured.  Woods Dec. ¶ 7.  The fact that a transaction is paying off a mortgage to an institutional lender is insufficient in New Mexico to show that a prior mortgage was insured.  Id. ¶ 8.  Because recorded documents do not generally have title company notations as in some of the other states, some additional evidence of prior insurance, like a copy of policy itself or the HUD-1 from a prior transaction showing a charge for title insurance, must be present to entitle a refinance transaction to a discounted rate.  Id. ¶ 7.  Accordingly, reviewing the title commitment and HUD-1 does not reveal whether a transaction qualified for the substitution rate.  Sandoval Dec. ¶ 19.

**Defendant's Opposition to Class Certification**

5.      Arizona

Under the Arizona rate manual, a discounted revamping/refinancing rate is available for lender's policies when there was a prior lender's policy issued as to the same borrower insuring the same property, or when there was a prior owner's policy insuring that borrower issued by First American.  Declaration of Steve Hyman ("Hyman Dec.") ¶ 5.  The prior policy must have been issued within five years of the current transaction.  Id.  The rate manual also provides that use of the discounted rate is at the sole discretion of First American if the original loan was insured by a company other than First American.  Id. ¶ 9.  In Pima County (where Tucson is located), the discount is only available if the lender places a minimum of 15 refinance orders per month.  Id. ¶ 8.

In Arizona, First American issues policies through both direct operations and a network of over 30 agents.  Id. ¶¶ 10, 17.  In a typical transaction, the title examiner begins the process of preparing a title commitment by looking at a list of prior recorded instruments, including prior mortgages and deeds.  Id. ¶ 12.  This list indicates who recorded the prior document.  Id. ¶ 12.  If a title insurance company recorded a prior deed of trust, First American assumes that the mortgage is insured with a lender's policy.  Id. ¶ 13.  In Arizona, First American generously offers discounted rates in refinance transactions – even advertising the availability of the revamping rate - to be competitive in the market.  Id. ¶¶ 15-16.

B.      Plaintiff Deborah Lewis

1.      Plaintiff's Transaction in Idaho

In 1984, Plaintiff Deborah Lewis ("plaintiff" or "Lewis") purchased a house in Nampa, Idaho.  Deposition of Deborah Lewis-Wong ("Lewis Dep.") p.35 (attached as Exh. A to Ferrick Declaration).  In February 2004, plaintiff mortgaged the home.  Id. p. 69-70, Exh. 11.  In connection with the  transaction, Lewis paid the premium for a lender's policy of title insurance.  Doc. 7 ¶ 31. In November 2005, Lewis  refinanced the mortgage and again paid the premium for a lender's policy

7

**Defendant's Opposition to Class Certification**

of title insurance.  Lewis Dep. Exh. 16.  The policy was issued by an independent agent, Pioneer Title Company, and underwritten by First American.  Id. p. 12 and Exh. 16 thereto; Doc 7 ¶ 32.  Despite the stated requirement of the Idaho rate manual, Lewis did *not* provide Pioneer with a copy of the prior lender's policy or any other evidence that a prior lender's policy existed.  Lewis Dep. p. 85-86.  Ignoring that requirement, plaintiff maintains that she should not have been charged the "basic" rate for a lender's policy of title insurance because her prior lender's policy was issued less than two years before.  Doc. 7 ¶¶ 35-36.

### 2.        Plaintiff's Lawsuit and Motion for Certification of a Multi-State Class Action

Plaintiff was solicited by one of her lawyers, Ben Schwartzman, to participate in this lawsuit.  Lewis Dep. p. 15, Exhs. 1-2.  At the time she received the solicitation, plaintiff did not know she had purchased a title insurance policy from First American and had no complaints against First American.  Id. p. 15, 20.  Without reviewing her closing documents, contacting First American or her lender, or otherwise investigating whether she had a complaint against First American, Plaintiff responded to the solicitation.  Id. p. 15, 20, 26.  Plaintiff had never heard of Mr. Schwartzman or his law firm and knew nothing of their class action experience, but she agreed to serve as the proposed class representative in this action after one brief phone call.  Id. at p. 17, 26-27.  She did not ask anyone about Mr. Schwartzman or otherwise investigate his class action experience.  Id. p. 17, 30-31.

Mr. Schwartzman and two other law firms – Freed & Weiss and the law firm of Paul Augustine[2] - filed this multi-state putative class action lawsuit against First American alleging it "knowingly and deliberately overcharges" its customers for title insurance in Idaho, Washington, Oregon, New Mexico, and Arizona.  Doc. 1.  Although plaintiff has never owned a home, purchased title insurance, or had any interaction with First American in Washington, Oregon, New

---

[2] Plaintiff has never heard of either firm and does not know whether they represent her in this lawsuit.  Lewis Dep. p. 40.

**Defendant's Opposition to Class Certification**

2937647.6

Mexico, or Arizona (Lewis Dep. p. 37), she is the sole proposed representative.  Doc 1 ¶ 17.  At the time the complaint was served, plaintiff did not know she was attempting to represent a multi-state class (Lewis Dep. 37) and did not know which lawyers represented her in the lawsuit.  Id. at p. 40.  Nor did she review the complaint or check to see if the factual allegations were accurate.  Id. at p. 44-45.

The complaint initially asserted eight counts.  Doc. 1.  Without her knowledge (Lewis Dep. 43), plaintiff's counsel later filed an amended complaint adding a New Mexico plaintiff, Quinn Woodard, as another proposed class representative.  Doc. 7.  Mr. Woodard's claims against First American were voluntarily dismissed with prejudice after plaintiff's counsel determined that Woodard's lender paid his closing costs, including the premium for the lender's policy of title insurance.  Doc. 30.  Because it was a "no-cost" refinance transaction, Mr. Woodard could not allege he was damaged.  First American moved to dismiss plaintiff's complaint.  The Court granted First American's motion, in part, and dismissed three counts.  Doc. 27.

Without taking a single deposition of any First American employee or agent in any of the five states, plaintiff moved to certify the following five-state class:

> Persons in the states of New Mexico, Arizona, Washington, Idaho and Oregon who, in connection with a mortgage refinancing, paid a title insurance premium for a First American Title Insurance Co. title insurance policy, the amount of which exceeded the rate on file in those states and/or exceeded a lower, refinance rate for which such persons qualified.

Doc. 50 p. 10.  Plaintiff only moved for class certification of her unjust enrichment (Count 6) and declaratory and injunctive relief claims (Count 1).  Doc. 50. p. 10.[3]  The motion for class certification

---

[3] The remaining claims include: declaratory and injunctive relief (Count 1), breach of contract (Count 3), violation of the consumer protection acts of Washington, Oregon, New Mexico, and Arizona (Count 4), unjust enrichment (Count 6), and breach of the duty of good faith and fair dealing (Count 7).  Doc. 27.

9

**Defendant's Opposition to Class Certification**

does not explain why she seeks certification of a class of customers from these five states or of only those two counts.  Doc. 50.

**C.  Plaintiff's "Evidence" (Or Lack Thereof) In Support of Class Certification**

    **1.  Plaintiff Submitted 18 HUD-1s, But Only One Transaction Was Possibly Entitled to a Discount.**

Plaintiff's evidence in support of class certification is sparse to say the least.  She attached to her motion for class certification only 18 HUD-1s:  seven from Idaho, four from Washington, four from Oregon, two from Arizona, and one from New Mexico.  As an initial matter, Plaintiff does not explain how she acquired these 18 HUD-1s or why they are allegedly "representative" of the putative class.  Doc. 50 p. 13.  Instead, she merely asserts that an unspecified "review" of the HUD-1s "illustrates that overcharges were perpetrated in over 80% of the cases."  Id.  Plaintiff does not explain which of the 18 HUD-1s supposedly contained an overcharge.  Id.  Whatever "review" plaintiff conducted was fundamentally flawed, and her "conclusion" is patently incorrect.  Experienced First American managers in Idaho, Washington, Oregon, New Mexico, and Arizona analyzed the transactions at issue in each of the 18 HUD-1s.  Brayton Dec. ¶¶ 25-29, Moore Dec. ¶¶ 43-47, Brickley Dec. ¶¶ 20-21, Sandoval Dec. ¶¶ 17-18; Hyman Dec. ¶¶ 20-23.  When possible, they reviewed both the HUD-1s and the underlying closing files to determine what rate each was entitled to under the terms of the applicable rate manual and the circumstances of each transaction.  Then they determined whether the transactions received that rate.  Id.  For Idaho, six of the seven transactions involved policies issued by Old Republic National Title Insurance Company, not First American.  Brayton Dec. ¶ 29.  The remaining transaction received the discounted reissue rate.  Id. ¶ 28.  For Washington, three of the four transactions were charged the appropriate rate under the applicable rate manuals.  Moore Dec.  ¶¶ 43-47.  For Oregon, all of the  transactions were charged the appropriate basic rate – none was entitled to the discount under the applicable rate manual.  All

**Defendant's Opposition to Class Certification**

four transactions had a prior vesting deed or trust deed that was outside the three-year window required by the rate manual. Brickley Dec. ¶¶ 20-21. The one HUD-1 from New Mexico related to Quinn Woodard's transaction, but his claim against First American was already dismissed with prejudice because his lender paid his closing costs. Sandoval Dec. ¶¶ 17-19. In Arizona, both transactions received the discounted revamping rate (although one was slightly miscalculated based on a clerical error). Hyman Dec. ¶¶ 20-23. In sum, excluding Woodard's transaction, only **one** of the 18 HUD-1s plaintiff relies on as evidence in support of class certification involved a transaction that may have been entitled to but did not receive a discounted title insurance premium rate in connection with a refinance transaction. Moore Dec. ¶ 46. While it is unclear how plaintiff arrived at her conclusion that 80% of the 18 HUD-1s contained an overcharge, there is no doubt she is wrong.

2. **Plaintiff's Review of 112 Oregon HUD-1 Settlement Statements Is Inaccurate and Contains Glaring Miscalculations.**

In addition to the 18 HUD-1s attached as "evidence" to the motion for class certification, plaintiff asserts she reviewed "100 HUD-1s" from refinance transactions in Oregon. Doc. 50 p. 8. Plaintiff asserts that only 2 of the 100 transactions received a discount. Id. Again, this conclusion is wildly incorrect. To begin with, plaintiff asserts that she "randomly" selected the "100 HUD-1s" from approximately 375 produced in response to her subpoenas to independent title agents in Oregon. Doc. 50-2 ¶ 13. In actuality, she reviewed 112 HUD-1s taken from a pool of 368 produced by just three agents who do business almost exclusively in rural Oregon. Dobson Dec. ¶¶ 10, 12-13. Nor does it appear that the sample was selected randomly; instead, the review concentrated on the first one-third of the HUD-1s produced. Id. ¶ 13. Critically, many of the policies issued in connection with the 368 HUD-1s were *not* underwritten by First American, the

**Defendant's Opposition to Class Certification**

only defendant in this action, but rather were underwritten by Title Co., a separate and distinct corporation independently licensed by the State of Oregon. Id. ¶¶ 2, 8.

Counsel for Title Co. oversaw a review of the 368 HUD-1s produced by Oregon agents to determine how many of the transactions were charged a discounted rate. Id. ¶ 14. Title Co. could not conclusively determine from the HUD-1 alone whether a transaction was charged a basic or short term discounted rate. Id. ¶ 15. In order to do so, it would have had to subpoena each of the underlying closing files from the agents and determine: (1) whether the underlying policy provided standard or extended coverage, and (2) whether the policy was issued with any endorsements. Id. ¶¶ 15-16, 18. Instead, it had to assume that each lender, as is standard practice in Oregon, asked for the more expensive extended coverage. Moreover, for transactions in which the HUD-1 did not identify what, if any, endorsements were included, it assumed in certain instances when the rate exceeded either the basic or discounted rate by exactly $50 or $100 that endorsements were included in the charge. Id. ¶¶ 18-19.

Nearly 50% of the 368 transactions received a discount. Id. ¶ 20. Contrary to plaintiff's conclusion, 51 of the 112 HUD-1s she allegedly reviewed received the discount. Id. ¶ 21. Plaintiff's claim that only two of them received a discount is preposterous. Her counsel clearly did not understand Oregon practices as to extended coverage and charges for endorsements. Moreover, it is not possible to determine from a review of the HUD-1 whether any of the transactions that did not receive it actually qualified for the short term rate. Id. at ¶ 22. The HUD-1s do not indicate whether a prior owner's, lender's, or leasehold policy previously insured the property or the date such a policy may have been issued – both critical pieces of information to determine if a transaction qualifies for the "short term" rate. Id.

**Defendant's Opposition to Class Certification**

**D.      First American Does Not Have the Necessary Data to Identify Putative Class
         Members in Any of the Five States.**

**1.      First American's Data Capabilities in Idaho, Washington And Oregon**

First American's direct operations in Idaho, Washington, and Oregon use the FAST system.
Declaration of Peter Van Der Linden ("Van Der Linden Dec.") ¶ 6.  FAST is both a production
system (<u>i.e.</u>, it produces title insurance policies) and a database for the storage of information relating
to past transactions.  <u>Id.</u> ¶ 6.  First American has used FAST in these three states since at least
December 2002.  <u>Id.</u> ¶ 7.  FAST does not capture data indicating at what rate a specific policy was
charged or whether there were endorsements; instead, FAST only captures the total premium paid
for a policy.  <u>Id.</u>  FAST also does not capture any data that indicates: (1) whether a prior loan on the
property was insured, (2) when the prior policy (if any) was issued, (3) whether reasonable proof of
the prior policy was provided to the closing agent, (4) whether the property is the same as that
previously insured, or (5) whether the borrower on the prior mortgage (if any) is the same as the
current borrower.  <u>Id.</u> ¶ 11.  For these reasons, it is not possible to run a query on FAST to
determine what transactions were entitled to, but did not receive a discounted rate for title insurance
in Idaho, Washington, and Oregon.  <u>Id.</u> ¶ 12.

During 2006 and 2007, First American began to implement the STARS system in Idaho,
Washington, and Oregon.  <u>Id.</u> ¶ 13.  This system tracks information on policies issued by First
American's agents in these states.  <u>Id.</u>  Because of the length of the implementation process, reliable
data for policies issued by agents in these states is only available dating back to January 2008.  <u>Id</u>.
Before the use of STARS, there was no electronic database that tracked data on policies sold by
agents in Idaho, Oregon, or Washington.  <u>Id.</u> ¶ 14.  Limited information was recorded in various
Excel spreadsheets, but this data does not include at what rate a policy was issued or information as

**Defendant's Opposition to Class Certification**

to whether a policy was issued in connection with a refinance, much less whether the same property was previously insured or when such a policy may have been issued.  Id.

### 2.      First American's Data Capabilities in Arizona and New Mexico

Data relating to policies issued by direct operations in New Mexico and Arizona are also retained by the FAST system.  Declaration of David Terrill ("Terrill Dec.") ¶ 6.  FAST became operational in New Mexico on or before December 2002 and in Arizona on or before the first quarter of 2003.  Id. ¶ 7.  In Arizona and New Mexico, as in Idaho, Washington, and Oregon, FAST only captures the total premium paid for a policy.  Id. ¶ 10.  Accordingly, it is not possible to run a query on FAST to determine what transactions were entitled to, but did not receive, a discounted rate for title insurance in Idaho, Washington, and Oregon.  Id. ¶ 12.

Since at least 1999, in order to comply with data requirements of the New Mexico Department of Insurance, First American has also used the FoxPro system to track data compiled for policies issued by both its direct operations and by its agents in New Mexico.  Declaration of Wesley Daniels ("Daniels Dec.") ¶ 7.  The FoxPro system tracks the transaction code for each policy issued in New Mexico.  Id. ¶ 9.  The transaction code indicates the rate a transaction was charged and whether the transaction involved a refinance.  Id.  FoxPro does not record, however, whether there was a prior policy insuring the property at issue, or whether the transaction involved paying off a prior mortgage, or the amount of such a payoff.  Id. ¶ 10.

From 2002 through 2007, First American did not use any database for policies sold by agents in Arizona.  Terrill Dec. ¶ 14.  Limited information was recorded in various Excel spreadsheets, but this information does not include what rate a policy was issued at or whether a policy was issued in connection with a refinance.  Id.  In 2007, First American implemented the STARS system to track data related to policies issued by agents in Arizona.  It has the capability to track detailed information related to agent-issued policies (including the rate at which a policy was

14

**Defendant's Opposition to Class Certification**

issued, whether it was issued in connection with a refinance transaction, and whether a prior policy insured the property).  However, it was not implemented until the last year of the putative class period and does not have data on policies issued before its "go live" date.  Terrill Dec. ¶ 14.

Lender's Advantage was a former division of First American that worked exclusively with lenders.  Declaration of Valerie Lewis ("Lewis Dec.") ¶ 2.  From 1999 to 2007, First American used the WinTrack system to track data on policies issued by Lenders Advantage in Arizona.  Id. ¶ 6.  The WinTrack system collects data that indicates whether a policy was issued in connection with a refinance transaction, but it does not contain any data that would indicate whether there was a prior policy on the property, the date of that policy (if any), and whether the prior policy (if any) insured the same property and borrower.  Id. ¶ 8.

## III.    ARGUMENT

### A.    This Court Must Undertake a Rigorous Analysis of All of the Rule 23 Requirements.

Plaintiff's assertion that this Court should not delve into the merits of any of her underlying claims at the class certification stage is incorrect.  Doc. 50 p. 9.  Rather, the law is clear that this Court must conduct a rigorous analysis and not simply accept the complaint's averments as true.  Duke v. Wal-Mart, Inc., 509 F.3d 1168, 1178 n. 2 (9th Cir. 2007)(court "'must' consider evidence which goes to the requirements of Rule 23 [at the class certification stage] even [if] the evidence may also relate to the underlying merits of the case" ).  The law places the burden of establishing each element necessary for a class action on the party seeking class certification.  Amchem Prods, Inc. v. Windsor, 521 U.S. 591, 613-14 (1997).  "There is no basis for thinking that a specific Rule 23 requirement need not be fully established just because it concerns, or even overlaps with, an aspect of the merits."  In re Initial Public Offering Sec. Litig., 471 F.3d 24, 32 (2d. Cir. 2006); see also Szabo v. Bridgeport Machines, Inc., 249 F.3d 672, 675 (7th Cir. 2001)("The proposition that a

**Defendant's Opposition to Class Certification**

district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it").

**B.      Rule 23(b)(3)'s Predominance Requirement Is Not Satisfied.**

In a Rule 23(b)(3) class action, predominance is not satisfied unless the substantive elements of each putative class member's claims require the same proof.  Implicit in the predominance test is "the notion that the adjudication of common issues will help achieve judicial economy."  Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996); see also Zinser v. Accufix Research Institute, Inc., 253 F.3d 1180, 1189 (9th Cir. 2001).  Although plaintiff seeks certification of only her unjust enrichment and declaratory and injunctive relief claims, individual factual and legal issues still pervade this case.  Material differences in the rates, their implementation, and state substantive law make it impossible for plaintiff to prove her claims on a classwide basis and thus make this case inappropriate for class certification.

**1.      Individual Issues of Fact Predominate Over Common Questions.**

The only truly "common" fact presented in this putative multi-state class action is that First American sells title insurance policies in each of the five states.  Everything else is swamped by individual issues that vary, including, by example:  (1) the rates that First American charges for title insurance in each state; (2) the terms of the discounted rate; (3) how the discounted rate is implemented; (4) when the discounted rate applies; (5) what evidence is sufficient to qualify a transaction for the discounted rate; (6) whether proof of prior insurance is needed to qualify for the discounted rate; and, if so, (7) what constitutes sufficient proof of prior insurance; and (8) whether the burden is on the customer to present that evidence before closing.  All of these issues vary from state-to-state, county-to-county, and agent-to-agent.  Moreover, whether any particular transaction was entitled to receive a discounted rate depends on: (9) whether a prior *policy* exists (not just a prior mortgage as plaintiff suggests), and if so, (10) what type of policy it is, (11) the date of its issuance,

16

**Defendant's Opposition to Class Certification**

(12) whether it insured the same property, and (13) whether the same borrower was on the prior mortgage.

As plaintiff concedes, no class member can prove First American was unjustly enriched without first establishing that her refinance transaction was entitled to, but did not receive, a discount under the applicable rate manual.  Doc. 50-7 p. 8.  The evidence each class member will need to submit to prove entitlement to a "refinance" discount *cannot* be determined merely from a review of a HUD-1, a title commitment and the applicable rate manual.  Even if such a review could prove whether a particular class member was entitled to a discounted rate, this tedious file-by-file review would need to be repeated for each and every transaction in each of the five states during the class period.  It would entail a review of literally hundreds of thousands of files for hundreds of thousands of transactions.  For these reasons, "the individual questions of whether each class member suffered economic injury present[ ] insurmountable obstacles to certification."  Newton v. Merrill Lynch, Pierce, Fenner, & Smith, Inc., 259 F.3d 154, 188 (3d Cir. 2001).

### (a)   Determining which transactions *received* a discounted rate requires detailed file-by-file review.

The first issue to determine liability is whether a transaction received the discounted rate.  If so, the borrower has not been injured and is not a member of the class.  Even this threshold issue is plagued by individual factual determinations.  For most of the class period, except in New Mexico, First American does not retain electronic data that identifies the rate (i.e. basic or reissue) at which a policy is issued.  Van Der Linden Dec. ¶ 6, 7, 11, 12; Terrill Dec. ¶ 6, 7, 11, 14; Lewis Dec. ¶ 6, 8.  For policies issued in Idaho, Washington, Oregon, and Arizona it must be determined on a file-by-file basis – an onerous task that defeats class certification in itself.

The analysis that must be conducted to determine at what rate a particular policy was issued is complicated and fact specific.  Contrary to plaintiff's bald assertion, this question cannot be

17

**Defendant's Opposition to Class Certification**

answered by "simple arithmetic" taken from the HUD-1.  Doc. 50-7 p. 17.  In Idaho, the reissue rate is based on the liability amount of the prior lender's policy.  Brayton Dec. ¶¶ 7-8.  This is not indicated on the HUD-1 or title commitment but must be determined from the prior policy itself or the recorded mortgage.  Id.  In Idaho, Oregon, and Arizona, First American offers different levels of coverage at different prices.  Id. 20-23;  Brickley Dec. ¶¶ 9-10; Hyman Dec. ¶ 8.  Obviously, the level of coverage affects the premium cost, but the type of coverage cannot be determined from the HUD-1 or title commitment either.  Brayton Dec. ¶ 24; Dobson Dec. ¶ 15.  In at least one county in Arizona, the discounted rate is only available if the lender places a minimum of 15 orders per month.  Hyman Dec. ¶ 8.  In all counties in Arizona, use of the discounted rate is at the sole discretion of First American if the original loan was insured by a company other than First American.  Id. ¶ 9.  This too cannot be determined from the HUD-1 or title commitment.  Finally, some lenders request endorsements to policies that increase the premium charged.  Dobson Dec. ¶ 16.  This too may not be apparent from the HUD-1 or title commitment.  Id. ¶ 17.  Even if plaintiff (or as plaintiff proposes in her trial plan a magistrate or special master) committed the time and resources to review the HUD-1 and title commitment for each of the hundreds of thousands of transactions during the class period, it would not be possible to determine the rate charged in a particular transaction in many of the cases without subpoenaing the files of the agents that issued the policies.  Id. at ¶¶ 14-16, 18.  (And when the agents' files do not have copies of the policies, it may be necessary to subpoena the prior underwriters.)

Plaintiff's own ill-fated review of 112 HUD-1s from Oregon pointedly illustrates this fact. Her determination of whether a transaction received the discounted rate was wrong for nearly *half* of the transactions.  Dobson Dec. ¶¶ 20-21.  Plaintiff claims that her review only uncovered two transactions that received the discounted rate.  Doc. 50 p .13.  In actuality, 51 of the 112 HUD-1s

**Defendant's Opposition to Class Certification**

she reviewed received the discount.  Dobson Dec. ¶ 21.  Her counsel was not able to determine the rate charged from the HUD-1 alone; nor could this Court or a trier of fact.[4]

**(b)     Whether a transaction was *entitled* to the discounted rate involves even more case-by-case factual determinations.**

Plaintiff's theory of the case is grossly oversimplified.  She asserts that the mere presence of a prior *mortgage* in the chain of title is sufficient evidence of a prior title insurance policy to qualify a refinance transaction for a discounted rate.  Doc. 50 p. 8.  However, none of the rates provides that a discount must be given if a prior *mortgage* was taken on the property.  Each requires the existence of a prior policy, and a mortgage is not usually a sufficient proxy for a policy.  Brayton Dec. ¶¶ 5-6; Moore Dec. ¶¶ 20-42; Brickley Dec. ¶¶ 4, 7-8; Sandoval ¶ 5; Hyman ¶¶ 4-6.  Idaho's rate manual goes farther by requiring that the prior policy or other proof be presented prior to closing.  Brayton Dec. ¶ 6, Exh. 1.  First American simply is not required by the terms of the rates to accept evidence of a prior mortgage in the chain of title as evidence of prior insurance.

Practically, a title commitment lists prior unsatisfied mortgages against the property, but it does not reveal whether any mortgage was insured.  Brayton Dec. ¶ 12.  And contrary to plaintiff's contention, lenders do *not uniformly* require title insurance in connection with refinance transactions – this is particularly true for junior mortgages and home equity loans.  Brayton Dec. ¶ 16.  In order to confirm the existence of insurance, both First American and its agents frequently require something "more."  In Washington and Oregon, First American acquires copies of the prior recorded documents and looks for notations from the recording title company, including a policy number.  Moore Dec. ¶ 13; Brickley Dec. ¶ 13.  In New Mexico, it is not common practice to place notations

---

[4] Plaintiff's motion for class certification also blurs the distinction between First American and Title Co.  Doc. 50 p. 13.  She submits a review of 112 Oregon HUD-1s as "evidence," but fails to mention that many of those HUD-1s involve policies issued by Title Co., *not* by First American.  Id.  Plaintiff has not submitted any evidence to suggest she has standing to maintain a lawsuit against Title Co., much less that claims against Title Co. satisfy the predominance requirement of Rule 23(b)(3).  E.g., Smith v. Block, 784 F.2d 993, 995 (9th Cir. 1986).

**Defendant's Opposition to Class Certification**

on recorded mortgages.  First American therefore requires a copy of the prior policy or HUD-1 statement from the prior transaction showing a charge for title insurance.  Woods Dec. ¶¶ 7-9. Even in Idaho, where First American's direct operations frequently accept a prior mortgage in the chain of title as evidence of a prior policy, additional inquiry is sometimes required.  Brayton Dec. ¶¶ 15-16.  Moreover, some agents in Idaho require actual production of the policy or other evidence, as they are entitled to do under the rate manual as approved by the Insurance Commissioner, and they expressly disclose that requirement in the title commitment.  Id. ¶ 20.  It is simply not possible to determine whether a prior policy exists without an extensive review of the closing file for each transaction during the class period, and evidence beyond even the agent's closing file will be required in most instances.

It also is not possible to determine whether a refinance transaction satisfies the other requirements necessary to qualify for a discounted rate without reviewing each closing file.  There are *27* different rates at issue in plaintiff's putative class action.  Brayton Dec. ¶ 6; Moore Dec. ¶¶ 6, 20-42; Brickley Dec. ¶ 5; Sandoval Dec. ¶ 4; Hyman Dec. ¶¶ 5-6.  Each has its own specific requirements.  In Idaho, a borrower needs to show: (1) a prior lender's policy; (2) insured her property (3) in the last two years and (4) that the prior policy or proof thereof was presented to First American prior to closing.  Brayton Dec. ¶¶ 5-6, Exh. 1.  Each Washington borrower needs to prove that: (1) a prior lender's policy (2) insured the same property.  Moore Dec. ¶ 6.  In some counties in Washington, (3) the same borrower must be involved in both transactions.  Id.  In Oregon, a borrower needs to show: (1) either a prior owner's policy or a prior lender's policy (2) insured the property (3) in the last three years.  Brickley Dec. ¶ 5.  In New Mexico, a borrower only needs to show a prior lender's policy insured the property within a certain period of time.  Sandoval Dec. ¶ 5. In Arizona, a prior lender's policy qualifies for the discount only if:  (1) the same borrower is involved in both transactions, (2) the prior lender's policy (3) was issued in the last five years and (5)

20

**Defendant's Opposition to Class Certification**

it insures the same property or (1) the same borrower is involved in both transactions, (2) a prior owner's policy (3) was issued by First American (4) in the last five years and (5) insures the same property. Hyman Dec. ¶¶ 5-6.  In addition, First American has the discretion to give the discounted rate if the entitlement to the discount is based on a lender's policy issued by a different title company.  Id. ¶ 9.  Plaintiff has not proposed manageable subclasses to take into account the differences in the 27 rates at issue in this case.  Nor has she shown that subclasses would meet the requirements of Rule 23(b)(3).  Her motion for class certification must be denied for this reason alone.  Zinser, 253 F.3d at 1190.

Regardless of subclasses, Plaintiff does not have evidence that any other member of the putative class satisfied these requirements to qualify for a discounted rate in any state, and her proposed trial plan falls woefully short of demonstrating how to try this case to a jury without requiring hundreds of thousands of individual "mini-trials."  See Section III.E. below.  Nor is there any report First American can run or electronic data it can pull to magically erase the plethora of individual issues.  First American cannot identify the class from FAST, WinTrack, FoxPro, or from the Excel spreadsheets that summarize agent data prior to the implementation of STARS. Membership in the class depends on data that First American does not have.  Lewis Dec. ¶ 8, Daniels Dec. ¶ 10, Terrill Dec. ¶ 12, Van Der Linden Dec. ¶¶ 10-11, 14.  For policies issued by First American's direct operations in Idaho, Washington, Oregon, New Mexico, and Arizona, to identify the class, it would be necessary to review documents from each closing file to determine if: (1) the transaction was in fact a refinance; (2) there was a prior mortgage on the property; (3) the prior mortgage was insured; (4) the prior insurance policy was on the same property; and (5) the prior insurance policy (if any) was for a transaction involving the same borrower.  This review, while some of it could be done on computer screens instead of paper, would still be tedious, labor-intensive, and virtually the same as reviewing paper files.

**Defendant's Opposition to Class Certification**

The problem is even more acute for policies issued by agents. For the vast majority of the class period, First American has *no* electronic data for policies issued by agents in Idaho, Washington, Oregon, and Arizona. The information for agent-issued policies in those states is on Excel spreadsheets, but these spreadsheets are as useless as the FAST system when it comes to the data needed to determine class membership. In New Mexico, FoxPro can identify policies issued in connection with refinance transactions, but it does not store sufficient data to determine if the transaction was entitled to a discounted rate. Daniels Dec. ¶ 10. In all the states, First American does not even have the closing files for policies issued by its agents. Agents keep their own files in these states. Recognizing this, plaintiff did not even attempt to ask First American for agent files, instead choosing to issue subpoenas, albeit only to agents in Oregon.

Membership in the class simply depends on information that First American does not have at all, much less electronically. Because plaintiff cannot demonstrate an overcharge can be proved on a classwide basis, common issues predominate and class certification is inappropriate. See, e.g., Osuna v. Wal-Mart Stores, Inc., 2004 WL 325430, * 6 (Ariz. Super. Dec. 23, 2004) (noting that "[a] number of courts have concluded that unjust enrichment claims are inappropriate for class certification because of the need for individual proof"); Saey v. CompUSA, Inc., 174 F.R.D. 448, 451-52 (E.D. Mo. 1997).

**2.      Unique Variations in State Law Also Make This Case Unsuitable For Classwide Adjudication:  Class Members Must Exhaust Administrative Remedies in Arizona and Oregon.**

In litigation that is in federal court on the basis of diversity of citizenship jurisdiction, and in which liability is based on state law rather than federal law, substantial variations in state law create individual issues that predominate over issues common to the putative multi-state class. Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1189-90 (9th Cir. 2001); see also Castano v. American

**Defendant's Opposition to Class Certification**

Tobacco Co., 84 F.3d 734, 741 (5th Cir. 1996); In re Rhone-Poulenc Rorer Inc., 51 F.3d 1293, 1301

(7th Cir. 1995).

Plaintiff has never explained why she added four states for which she has no co-plaintiff.

Regardless, her assertion that the substantive laws of each of the five states are "identical" is

inaccurate.  Doc. 50 p. 6.  In addition to the individual factual issues, there are material differences in

the substantive laws of the states that mandate denial of class certification.  Two of the proposed

class states have *mandatory* administrative remedies that must be exhausted before a plaintiff can file

suit against First American for an alleged premium overcharge.  A.R.S. § 20-379;[5] Or. Rev. Stat. §

737.505.[6]  Courts in other jurisdictions have held that similar administrative remedies must be

exhausted prior to filing suit.[7]

---

[5] With respect to rates charged, Arizona law provides that a title insurer may not "deviate
from its rates that are in effect" pursuant to Section 20-376.  The Director may hold a hearing to
determine if deviations have occurred, and, "[i]f the director finds that a title insurer . . . has charged
rates that deviate from" its filed rates, the insurer is subject to a civil penalty.  A.R.S. § 20-379.  If the
deviation resulted in an overcharge, the Director may require a refund of the overcharge instead of
imposing a civil penalty.  Id. § 20-379(B).  Under Arizona law, "if parties have statutory recourse to
an administrative agency that has authority to grant appropriate remedies, they must scrupulously
follow the statutory procedures.  If they fail to fully utilize all their administrative remedies, the
superior court lacks jurisdiction to consider their claim."  Estate of Bohn v. Waddell, 174 Ariz. 239,
245-46, 848 P.2d 324, 330-31 (Ct. App. 1992).

[6] Or. Rev. Stat. § 737.505 provides a mechanism by which aggrieved individuals can
challenge a title company's application of its filed rates or the rates filed by a rating organization to
which the title company subscribes.  Each rating organization or insurer "shall" provide "reasonable
means" for "any person aggrieved by the application of its rating system" to be heard in person.  Or.
Rev. Stat. § 737.505(1).  If the rating organization or insurer does not grant the aggrieved person's
request to heard within 30 days, or issues a decision that is not satisfactory to the aggrieved person,
she has the right to appeal to the Director of the Department of Consumer and Business Services.
Or. Rev. Stat. § 737.505(2).  The Director shall hold a hearing and affirm or reverse the decision of
the rating organization or insurer.  Id.  The law is well settled in Oregon that exhaustion of available
administrative remedies is required before seeking judicial review.  See Trujillo v. Pac. Safety Supply,
84 P.3d 119, 129 (Or. 2004).

[7] E.g., White v. Conestoga Title Ins. Co., 2008 WL 2227297, * 4-9 (Ct. of Common Pleas of
Phila. County, Pa. Apr. 21, 2008), appeal docketed (Pa. Super. Ct. May 13, 2008); Uyehara v.
Guarantee Title & Trust Co., 2008 WL 2227295, * 4-9 (Ct. of Common Pleas of Phil County, Pa.

23

**Defendant's Opposition to Class Certification**

Before this Court can adjudicate whether First American is liable to any class member from Arizona or Oregon, it would first need to determine whether that person pursued an administrative remedy, obtained a final agency decision, was granted any relief, and, if so, whether that relief mooted his claim against First American.   Certainly, none of the "evidence" plaintiff proposes to submit during the liability phase of trial will establish these facts for any class member (Doc. 50-7 p. 65-69), and there is no way to do so on a classwide basis.   Plaintiff cannot prove whether class members exhausted their administrative remedies on a classwide basis.   Therefore, unique variations in state law also destroy predominance in this case.   <u>See</u>, <u>e.g.</u>, <u>Ekahem v. Health and Hosp. Corp.</u>, 724 F.2d 563, 572 (7th Cir. 1983).

**C.      Plaintiff's Claim Is Not Typical of Class Members in Washington, Oregon, New Mexico, and Arizona.**

The typicality requirement of Rule 23(a), which tends to merge with the commonality and adequacy requirements, is satisfied only if the class representative's claims arise from the same events, practices, or conduct as those of other class members.   <u>Deiter v. Microsoft Corp.</u>, 436 F.3d 461, 466-68 (4th Cir. 2006)(typicality was lacking where putative class members had bought different products in different markets from those of class representative).   The absent class members' claims must be advanced by the class representative's proof of her individual claim.   <u>Id</u>.   There is no typicality if adjudication of the claims requires highly individual liability determinations.   <u>Lundquist v. Security Pac. Auto Serv. Corp.</u>, 993 F.2d 11, 14 (2d Cir. 1993).

As set forth above, plaintiff's potential proof of an overcharge under First American's rate manual in Idaho would not prove that any other class member was overcharged in Idaho, much less in Washington, Oregon, New Mexico or Arizona.   The salient issues in this case - First American's

---

Apr. 21. 2008, <u>appeal docketed</u> (Pa. Super. Ct. May 13, 2008); <u>Arthur v. Ticor Title Ins. Co. of Florida</u>, CA AMD 07-1737 (Mar. 11, 2008 D. Md.) (attached as Exh. B to Ferrick Declaration).

**Defendant's Opposition to Class Certification**

discounted rates, the requirements to qualify for those rates, and what constitutes sufficient evidence of prior insurance – vary from state to state and transaction to transaction.  See Section III.B.

Regardless, plaintiff has not set forth any admissible or credible evidence that suggests her claims are typical of class members' claims in Washington, Oregon, New Mexico, and Arizona. Brickley Dec. ¶¶ 20-21; Sandoval Dec. ¶¶ 17-18; Hyman Dec. ¶¶ 20-23.  Her "conclusion" that 80% of the 18 HUD-1s she reviewed contained an overcharge is patently false.  Six of the seven Idaho transactions involved policies issued by Old Republic Title Insurance Company, *not* First American. Brayton Dec. ¶¶ 25-29.  The remaining Idaho transaction received the discounted reissue rate.  Id. ¶ 28.  *All* of the Oregon transactions were charged the appropriate basic rate – none was entitled to the discounted under the applicable rate manual because the prior mortgage was outside the three-year window required by the rate manual.  Brickley Dec. ¶¶ 20-21.  The only HUD-1 from New Mexico related to Quinn Woodard's transaction, but his claim against First American was already dismissed with prejudice because his lender paid his closing costs.  Sandoval Dec. ¶¶ 17-19.  In Arizona, both transactions received the discounted revamping rate (although one was miscalculated based on a clerical error).  Hyman Dec. ¶¶ 20-23.  Three of the four transactions in Washington were charged the appropriate rate under the applicable rate manuals.  Moore Dec.  ¶¶ 43-47.  In sum, only *one* of the 18 HUD-1s plaintiff relies on as evidence in support of class certification involved a transaction that may have been entitled to but did not receive a discounted rate.  Moore Dec. ¶ 46.  After conducting multi-state discovery as permitted by the Court, plaintiff has *less* evidence, not more, to prove typicality.  Like her miscalculation of the 112 rates from Oregon HUD-1s, plaintiff's review of these 18 HUD-1s proves only that this case is wholly inappropriate for class certification.

Plaintiff's claims also would not be typical of all Idaho customers.  As permitted by the Idaho rate manual, some agents require that a copy of the prior policy or other evidence be

**Defendant's Opposition to Class Certification**

submitted prior to closing in order to qualify a transaction for the reissue rate and they disclose this requirement on the title commitment.  Brayton Dec. ¶ 20.  Plaintiff, who did not receive such a disclosure, is not typical of Idaho borrowers who did.

**D.    Lewis Is an Inadequate Class Representative.**

**1.    Plaintiff's Claims Are Subject to a Unique Defense.**

If a class representative's claims are subject to unique defenses central to the litigation, the representative is inadequate.  Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992); Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990)(class certification not appropriate where unique defense becomes focus of litigation).  Here, plaintiff's claim is subject to a unique defense that may become the focus of the litigation.  First American's "reissue rate" in Idaho, unlike the discounted rates in Washington, Oregon, New Mexico, and Arizona - has an express "presentation" requirement.  It provides, in pertinent part, that the discount only applies when "the prior policy or a copy thereof is *presented* to the issuing company and shall be retained in the issuing company's file, or in the absence thereof, reasonable proof of insurance is provided to the issuing company."  Brayton Dec. ¶ 6, Exh. 1 (emphasis added).  Plaintiff, however, admits she did not present any evidence of prior insurance to First American or its agent, Pioneer, before closing her refinance transaction.  Lewis Dep. p. 85-86.

Courts, interpreting similar language in other rate manuals, have held that it clearly requires *the customer to produce* evidence of an earlier policy.  Ricciardi v. Ameriquest Mortg. Co., 164 Fed. Appx. 221, 222-23 (3d Cir. 2006).  In Ricciardi, the plaintiff alleged Ameriquest failed to charge him a refinance rate discount although he was entitled to it under the governing Pennsylvania rate manual.  The rate manual provided, in pertinent part, that "[a] purchaser of a title insurance policy shall be entitled to purchase this coverage at the reissue rate if the real property to be insured is identical to or is part of real property insured 10 years immediately prior to the date the insured

**Defendant's Opposition to Class Certification**

transaction closes when *evidence of the earlier policy is produced* notwithstanding the amount of coverage provided by the prior policy" (emphasis added). The Third Circuit held Ricciardi was not entitled to receive the refinance rate even though a prior unsatisfied mortgage to an institutional lender clearly existed at the time of the transaction. Id. at 225-26. Under the rate manual a borrower "is entitled to the refinance rate only if the previous mortgage was insured. As Ricciardi presented no evidence prior to or at the loan closing that his previous mortgage was insured, Ameriquest appropriately charged him the default title insurance rates as published in the Rate Manual." Id. at 226.[8]

Here, plaintiff's claim, unlike the claims of putative class members in Washington, Oregon, New Mexico, and Arizona - is subject to the same defense as in Ricciardi and its progeny. Because it is unique to plaintiff's claim under the Idaho rate manual and is key to the central issue in this case – i.e., whether she was entitled to the discounted rate in connection with her refinance transaction – she is not an adequate representative for persons alleging overcharges of First American's rates in Washington, Oregon, New Mexico, and Arizona.

**2.      Plaintiff Lacks the Knowledge, Understanding and Control to Serve as Class Representative.**

Determining whether a proposed class representative is adequate also "mandates an inquiry into ... the willingness and ability of the representative…to take an active role in and control the litigation and to protect the interests of absentees." Berger v. Compaq Computer Corp., 257 F.3d 475, 482 (5th Cir. 2001) (citations omitted). The proposed class representative must "possess a sufficient level of knowledge and understanding to be capable of controlling or prosecuting the litigation." Id. at 482-3. An individual is an inadequate class representative if she is ignorant of "the

---

[8] Several courts have followed Ricciardi. See In re Escher, 369 B.R. 862 (Bankr. E.D. Pa. 2007); In re Fields, 2006 WL 2191342 (Bankr. E.D. Pa. July 31, 2006); In re Glauser, 365 B.R. 531 (Bankr. E.D. Pa. 2007), In re Madera, 363 B.R. 718 (Bankr. E.D. Pa. 2007); Jones v. Aames Funding Corp., 2006 WL 2845689 (E.D. Pa. Mar. 7, 2006); Stump v. WMC Mortg. Corp., 2005 WL 645238 (E.D. Pa. Mar. 16, 2005).

**Defendant's Opposition to Class Certification**

2937647.6

nature of [the] action, the facts alleged, and the theories of relief against the defendant." Bodner v. Oreck Direct, LLC, No. C 06-4756 MHP, 2007 WL 1223777, *2 (N.D. Cal. April 25, 2007). One court has held in a similar case that a plaintiff is not an adequate class representative if she does not know: what "mortgage title insurance is," what "fee title insurance is," or the difference between the two. Sicinski v. Reliance Funding Corp., 82 F.R.D. 730, 734 (S.D.N.Y. 1979). Nor is a plaintiff adequate if she has failed to take a supervisory role in the litigation. See e.g,. Griffin v. GK Intelligent Systems, 196 F.R.D. 298, 303 (S.D. Tx. 2000). A plaintiff solicited by class counsel, who does not participate in litigation decisions, and does not learn of activity until it is over and completed cannot represent a class. Id.

Like the plaintiffs in Berger, Bodner, Sicinski, and Griffin, Lewis has no involvement in, control over, or understanding of this lawsuit and is an inadequate class representative. Her transaction with First American did not motivate her to file this case. Her lawyers formulated this lawsuit before they had any knowledge of, or involvement with plaintiff. Plaintiff never would have brought this suit but for receiving a written solicitation from Mr. Schwartzman. Indeed Lewis testified that:

> she had not heard of and had no complaint against First American prior to receiving the solicitation (Lewis Dep. p. 45); she didn't even know she had paid the premium for a title insurance policy issued by First American prior to receiving the solicitation (id. at 15); she did not review her closing documents, contact First American, its agent, or her lender to investigate her claim prior to responding to the solicitation. Id. at 20-21.

Like Bodner, plaintiff also lacks basic knowledge of the "nature of [her] action, the facts alleged, and the theories of relief against [the] defendant." Bodner, 2007 WL 1223777, at *2. Lewis testified that:

> she doesn't know the name of the defendant in this action (Lewis Dep. p. 11-12); she does not know what title insurance is (id. at 33); she is unsure of the difference between an owner's policy and a loan policy (id. at 34); she has never reviewed the complaint or checked the factual allegations for accuracy

28

(id. at 44-45); (5) she does not know whether she purchased an owner's or lender's policy in connection with her prior refinance transaction – a requirement of eligibility for the discounted rate in Idaho.  Id. at 70-71.

Plaintiff simply does not fill the "supervisory role" of a class representative.  She does not even know *who* represents her in this lawsuit.  Lewis testified that"

> throughout the pendency of the lawsuit, she only met one of her five lawyers for less than two hours (id. at 39-40); she has never heard of or met anyone from the law firm of Freed & Weiss or Paul Augustine (id. at 40); she did not know that Mr. Woodard was a plaintiff in this lawsuit or that he had been dismissed withprejudice until she read it in the paper (id. at 43); she did not know First American filed a motion to dismiss and has never seen a copy of it or the order granting it, in part (id. at 45); she doesn't know anything about her counsel's class action experience (id. at 30); she does not know what class she seeks to represent or whether it includes persons in the states of Washington, Oregon, New Mexico, and Arizona.  Id. at 38.

Plaintiff has "so little knowledge of and involvement in the class action that [she] would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys."  Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1077-78 (2d. Cir. 1995). For all of these reasons, plaintiff is an inadequate class representative.

## E.    This Putative Multi-State Class Action Is Not Manageable.

Under Rule 23(b)(3)(1), the Court is also required to examine "the difficulties likely to be encountered in the management of a class action," which encompass "the whole range of practical problems that may render the class action format inappropriate for a particular suit."  Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 164 (1974).  Plaintiff submitted an "Exemplar Trial Plan" with her motion for class certification (Doc. 50-7), but it is fundamentally flawed.

### 1.    Due Process Requires Plaintiffs To Prove Liability On An Individual Basis.

Phase I suggests that a jury may decide the multifaceted fact issue of liability by reviewing a form HUD-1, a sample chain of title, and the applicable First American rates.  This is nonsense - unlike in a products liability case, the issue here is not whether all First American title insurance

**Defendant's Opposition to Class Certification**

policies are "defective."  Rather, the ultimate issue is whether each individual class member was overcharged.  In order to make this determination, a jury must apply the law to the facts of each particular transaction.  If this case proceeds to trial, First American has the absolute due process right to test each class member's claim of injury.  E.g., Eisen, 479 F.2d 1005, 1018 (2d. Cir. 1974), rev'd on other grounds, 417 U.S. 156 (1974); Windham v. American Brands, Inc., 565 F.2d 59, 72 (4th Cir. 1977); see also In re Fibreboard, 893 F.2d at 709-10 (rejecting statistical analysis that resulted in certain uninjured plaintiffs recovering damages);

When liability is premised on injury, plaintiffs must prove who suffered injury on a transaction-by-transaction basis.  E.g., Kline v. Coldwell, Banker & Co., 508 F.2d 226 n. 8 (9th Cir. 1974); Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 343; (4th Cir. 1998); Cimino v. Ray-Mark Indus., 151 F.3d 297, 312 (4th Cir. 1998); Newton v. Merrill Lynch, Inc., 259 F.3d 154, 187-89 (3d Cir. 2001); Sikes v. Teleline, Inc., 281 F.3d 1350, 1365 (11th Cir. 2002); Bell Atlantic Corp. v. Rochelle, 339 F.3d 294, 304-06 (5th Cir. 2003); Butt v. Allegheny Pepsi Cola Bottling Co., 116 F.R.D. 486, 491 (E.D. Va. 1987).  The fact that plaintiff asserts putative class claims does not "eliminate the ultimate need for individualized proof of [injury] by each member of the class."  Kline, 508 F.2d at 266 n. 8.  The law is clear that Rule 23 "does not alter the required elements which must be found to impose liability and fix damages."  Broussard, 155 F.3d at 312; Newton, 259 F.3d at 188.

Even under plaintiff's diluted theory of eligibility for the discounted rates (i.e., that evidence of a prior mortgage in the chain of title is proof of prior insurance), there is no way to determine if a class member qualified for a discounted rate without reviewing, at a minimum, the HUD-1 and title commitment for each and every transaction during the class period to determine if there was a qualifying prior deed or mortgage within the required number of years.  The mere fact that each class member has a HUD-1 and title commitment from the current transaction does not somehow

30

**Defendant's Opposition to Class Certification**

prove liability on a classwide basis. Instead, the Court would have to examine the information that appears on the HUD-1 and title commitment for each transaction. These issues are not capable of classwide adjudication. It is already known, for example, that of the 18 HUD-1s plaintiff submitted in support of her motion (Doc. 50 p. 13), First American's evidence shows that 17 of them were not overcharged, were not First American policies, or otherwise do not have a claim against First American. Brayton Dec. ¶¶ 25-29; Moore Dec. ¶¶ 43-47; Brickley Dec. ¶¶ 20-21; Sandoval Dec. ¶¶ 17-18; Hyman Dec. ¶¶ 20-23. The Court could not reliably extrapolate from one or two examples to any of these 17 policies, much less to thousands of absent class members. The 112 HUD-1s plaintiff's subpoenaed from Oregon agents are even more useless because (a) almost none of them are actually First American policies, (b) plaintiff did not realize how to calculate Oregon rates and did not understand that more than half of the policies received the discounted rate, and (c) plaintiff did not even attempt to show that any of the policies charged the full rate was eligible for a discount.

The HUD-1s and title commitments for each transaction do not provide sufficient evidence to establish liability (Section III.B. above). But plaintiff does not even propose to submit them as evidence (much less the entire closing file for each transaction). She knows that such a review would make this case clearly unmanageable. The closing files, the HUD-1s and title commitments for many of these transactions often are not even in the possession or control of First American. They are instead maintained by its independent agents. Plaintiff will have to do considerably more than she did in Oregon; she will have to subpoena the agents to obtain, review, and understand the entire files. Hundreds of thousands of transactions will need to be reviewed. The process will take years and years. It is hard to imagine a case that is less manageable as a class action.

### 2. An Aggregate Damage Analysis Is Improper.

Although titled "damages," Phase II of plaintiff's trial plan proposes to adjudicate *who* was overcharged and, therefore, involves a determination of both liability and damages. Plaintiff

31

**Defendant's Opposition to Class Certification**

proposes two equally deficient methods of "proof": (1) employ a statistician to calculate damages on a class-wide, aggregate basis after sampling a statistically significant number of individual transactions; or (2) actual review of each transaction by a magistrate or special master appointed by the Court. Doc. 50-7 p. 70. Both are inherently flawed.

Plaintiff proposes that she can prove the fact of an overcharge "by sampling a statistically significant number of individual transaction files in order to determine: (a) the percentage of persons overcharged; and (b) the average amount of the overcharge." Doc 50-7 p. 70. But statistical sampling is simply not a lawful substitute for individualized proof of injury. E.g., <u>Kline</u>, 508 F.2d 226 n. 8; <u>Broussard</u>, 155 F.3d at 343; <u>Cimino</u>, 151 F.3d at 312; <u>Newton.</u>, 259 F.3d at 187-89; <u>Sikes</u>, 281 F.3d at 1365; <u>Bell Atlantic Corp.</u>, 339 F.3d at 304-06; <u>Butt</u>, 116 F.R.D. at 491. If "a customer-by-customer examination would reveal that a portion of the proposed class never suffered any injury at all," proof of injury and damages cannot be proved through "statistical methods." <u>Butt</u>, 116 F.R.D. at 491, 492. Although plaintiff does not define the proposed mathematical calculation by which she intends to calculate the aggregate damages, she clearly specifies that any such calculation would include a "statistical sampling" and not a "file-by-file review." Doc. 50-7 p. 70. Such an approach fails to identify those borrowers who actually were overcharged and fails to eliminate those borrowers who were not.[9]

Even if the law permitted her to prove liability on an aggregate basis in these cases (which it unequivocally does not), plaintiff has not provided any detail regarding the proposed statistical analysis. She has not designated an expert to conduct the analysis or defined the proposed mathematical calculation or its sponsor. If plaintiff actually intended to rely on an expert to calculate

---

[9] Additionally, use of an aggregate damage model would also violate First American's Seventh Amendment right to trial by jury. <u>Cimino</u>, 151 F.3d at 321.

**Defendant's Opposition to Class Certification**

2937647.6

damages on an aggregate basis, she should have designated an expert during class discovery, provided the expert's report (including a proposed damages methodology), and presented the expert for deposition.   Doc. 18 ¶ 4.   Plaintiff, however, did none of this.   "Where, as here, there is substantial evidence of serious problems in calculating damages, the Court should not certify the class merely on the assurance that a solution will be found."   Butt, 116 F.R.D. at 492 (citing Windham v. American Brands, Inc., 565 F.2d 59, 70 (4th Cir. 1977)); see Saey, 174 F.R.D. at 451-52.

### 3.      Use of A Special Master Is Impermissible.

Plaintiff alternatively proposes that Phase II consist "of an administrative process in order to determine which specific consumers…qualified for, but did not receive, a reissue rate discount, and by how much they were overcharged."  Doc. 50-7 p. 71.  A file-by-file review would be conducted by a "magistrate or special master:"  Id.  As discussed above, the need to individually review each and every one of the tens of thousands of transactions during the proposed class period destroys predominance and dooms class certification.  Appointing a special master to review each class member's closing file in order to make the critical determination of who was overcharged and by how much, does not solve the problem; it just shifts the burden.

Moreover, this proposal also flies in the face of the Seventh Amendment right to trial by jury.  In a jury tried case, such as this one, Rule 53 of the Fed.R.Civ.P. provides that a master should be appointed only with the consent of the parties and only if the parties waive jury trial or submit the master's finding to the jury as evidence.  2003 Advisory Committee Notes; see also In re Bituminous Coal Operators' Ass'n, 949 F.2d 1165, 1168 (cited with approval by Beaser East, Inc. v. Mead Corp., 412 F.3d 429, 441 (3d Cir. 2005)).  The applicability of the Seventh Amendment is not altered because the case is a putative class action.  Cimino, 151 F.3d at 312, 321.  Here, First American has not consented to use of a special master and does not waive its right to have a jury

**Defendant's Opposition to Class Certification**

trial.  Accordingly, First American has the right to have a jury determine on an individual basis whom it supposedly overcharged.

**F.      A Class Action Is Not the Superior Method of Adjudicating Plaintiff's Claims**[10]

Under Rule 23(b)(3), one of the factors a court must analyze in determining whether a class action is the superior method of adjudicating a claim is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum."  Fed.R.Civ.P. 23(b)(3)(C).  Why plaintiff attempts to certify this particular multi-state class is a mystery.  The states are geographically dispersed; they span from the far Northwest to the deep Southwest (there are over 1100 miles between Tucson, Arizona and Boise, Idaho).  Each state has its own management group in charge of developing state-specific policies and procedures to reflect the necessities of local practice.  Doc. 36-2.  First American's rates, agent training, IT capabilities, and protocols are different in each of the five states.  Id.; See, e.g. , Hyman Dec.; Brayton Dec.; Brickley Dec.; Van Der Linden Dec.; Terrill Dec.; Moore Dec.; Sandoval Dec.; Woods Dec.  For the purpose of this lawsuit, nothing links these particular states.  Plaintiff's silence on this issue speaks volumes.  She offers no justification for the concentration of this litigation in this particular forum and none exists.  When, as here, the potential class members, witnesses, and evidence are dispersed across the country, there is no efficiency to be gained by having a single court adjudicate over a massive class action and superiority is not satisfied.  Zinser, 253 F.3d at 1191-92 (citing Haley v. Medtronic, Inc., 169 F.R.D. 643 (N.D. Cal. 1996)).

**G.      The Proposed Class Cannot Be Certified Under Both Rule 23(b)(2) and 23(b)(3).**

The purposes and applications of Rules 23(b)(2) and (b)(3) are different, and their requirements are incompatible.  For these reasons, this Court cannot certify plaintiff's single

---

[10] Here, class members in at least two of the states also have other superior methods of dispute resolution available to them that are simpler and more effective than litigation.  Or. Rev. Stat. § 737.505; A.R.S. § 20-379.  See Section III.B.

**Defendant's Opposition to Class Certification**

2937647.6

proposed class under both of these subsections of Rule 23(b).  Rules 23(b)(2) and (b)(3) are aimed at entirely different situations, serve different purposes, and have different requirements.  <u>See</u> Fed.R.Civ. P. 23(b) Advisory Committee Note (describing purpose of each subsection of Rule 23(b) and setting forth the paradigm for when class certification is appropriate under each subsection).  Class certification under Rule 23(b)(2) is only appropriate when the class seeks predominately injunctive and declaratory relief; conversely, Rule 23(b)(3) certification is appropriate when monetary damages are sought.  <u>Zinser</u>, 253 F.3d at 1190; <u>Thorn v. Jefferson-Pilot Insurance Co.</u>, 445 F.3d 311, 330-31 (4th Cir. 2006); <u>Zimmerman v. Bell</u>, 800 F.2d 386, 389-90 (4th Cir. 1986).

Certification of one class under both of these irreconcilable subsections of Rule 23(b) is improper.  There is no right to opt out of a Rule 23(b)(2) class (as it would destroy the very purpose of such classes), but the right to opt out of a (b)(3) class is mandatory.  Similarly, notice is not required under a (b)(2) class (because there is no right to opt out), while it is mandatory for a (b)(3) class.  <u>See</u> Fed.R.Civ.P. 23(c)(2)(A)-(B).; <u>Thorn</u>, 455 F.3d at 330 n.25.  Plaintiff's request for this Court to certify a single class under Rules 23(b)(2) and (b)(3) disregards the inherent differences of the two subsections.

## IV.    CONCLUSION

For all these reasons, Plaintiff's motion for class certification should be denied.

Date:    September 4, 2008            Respectfully submitted,

/s/ _____
Charles A. Newman (admitted *pro hac vice*)
Douglas W. King  (admitted *pro hac vice*)
Elizabeth T. Ferrick (admitted *pro hac vice*)
James M. Weiss (admitted *pro hac vice*)
BRYAN CAVE LLP

HAWLEY TROXELL ENNIS & HAWLEY LLP

Eugene A. Ritti  ISB No. 2156

35

**Defendant's Opposition to Class Certification**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 4th day of September, 2008, I filed the foregoing Defendant's Opposition to Plaintiff's Motion for Class Certification and Memorandum in Support Thereof electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Benjamin A. Schwartzman
802 W. Bannock Street, Suite 700
Boise, Idaho 83702
bas@baslawgroup.com

Paul J. Augustine
Law Offices of Paul J. Augustine, PLLC
1004 West Fort Street
P.O. Box 1521
Boise, Idaho 83701

Paul M. Weiss
Freed & Weiss, LLC
111 West Washington Street, Suite 1331
Chicago, Illinois 60602
paul@freedweiss.com

Attorneys for Plaintiffs Deborah Lewis

/s/ James M. Weiss_____
James M. Weiss

36

**Defendant's Opposition to Class Certification**